**UNITED STATES of America ex rel., Kenneth FISHER, Plaintiff,**

v.

**NETWORK SOFTWARE ASSOCIATES, et al., Defendants.**

**Civ.A. No. 99–3095 (PLF/JMF).**

United States District Court, District of Columbia.

Aug. 28, 2003.

Ira Eliot Hoffman, Grayson & Kubli, P.C., McLean, VA, Pamela Joy Bethel, O'Riordan Bethel Law Firm, Washington, DC, Alan Mark Grayson, Victor Aronoff Kubli, Grayson, Kubli & Hoffman, PC, McLean, VA, for plaintiff.

Edward Parrott, Watt, Tieder, Hoffar & Fitzgerald, L.L.P., McLean, VA, David Eric Sellinger, Venable, Baetjer, Howard & Civiletti, L.L.P., Cecil Elvis Key, Jr., Dewey Ballantine, L.L.P., Washington, DC, Beverly A. Johnson, Phleger & Harrison LLP, Irvine, CA, Philip R. Sellinger, Jason B. Lattimore, Greenberg Traurig, LLC, Florham Park, NJ,

Timothy Edward Heffernan, Watt, Tieder, Hoffar & Fitzgerald, L.L.P., McLean, VA, Aaron L. Handleman, Eccleston & Wolf, Washington, DC, for defendant.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This case has been referred to me by Judge Friedman pursuant to LCvR 72.2(a) for the purpose of resolving *Defendant Network Virginia's Motion for Partial Reconsideration* and the parties' *Joint Motion for Clarification.* For the reasons set forth below, defendant Network Virginia's motion for partial reconsideration will be granted. Furthermore, the parties' joint motion for clarification will be granted, resolving all pending relevancy and burdensome objections.

## BACKGROUND

I. *The Attorney–Client Privilege Documents*

In my Memorandum Opinion, dated January 29, 2003, I denied the application of the attorney-client privilege for the document labeled NSVA0121207–0121209 (herein referred to as "Document B") because I found it to be "the same document as NSVA 0004051–0004053 [(herein referred to as 'Document A')]." *Memorandum Opinion, January 29, 2003* at 8.

Document A is a letter from a client to an attorney regarding the valuation of stock and a spreadsheet as to the stock's value. I denied the attorney-client privilege claims as to these documents because I found that the letter and the spreadsheet did not disclose a communication intended to be confidential. *Id.* at 4. I then denied the privilege as to Document B because it appeared to convey the same substantive information as Document A, despite its difference in appearance. Defendant has now asked that I re-examine my conclusions.

II. *The Relevancy and Burdensome Documents*

On approximately March 8, 2002, relator served his first set of requests for production

of documents on defendants. *Relator's Statement of Points and Authorities in Support of His Motion to Compel Immediate Production of Documents* at 3. The following week, relator filed its third amended complaint and served defendants with the amended first requests for production. *Id.* None of the defendants produced any documents by the June 2002 deadline; instead, defendants cited a need for a protective order. *Id.* A protective order was subsequently granted on November 17, 2002. However, prior to entering into the protective order, relator filed a motion to compel on July 22, 2002.

In my Memorandum Opinion and Order, dated January 29, 2003, I required defendants to immediately disclose "all documents not protected by the attorney-client privilege." *Order, January 29, 2003* at 1. Subsequently, an issue regarding the interpretation of that Order arose. Relator interprets that Order as requiring defendants to "produce all documents they have withheld on grounds other than attorney-client privilege." *Joint Motion for Clarification* at 2. However, defendant interprets it to include only those documents challenged under the attorney-client privilege, leaving "all remaining issues involving the Motion to Compel and defendant's oppositions to that motion" for future resolution. *Id.* at 3. Both relator and defendant have asked me to clarify the scope of my order, and I shall do so now.

## DISCUSSION

III. *Legal Standard for the Attorney–Client Privilege*

■■■ The attorney-client privilege "protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services." *Overseas Private Inv. Corp. v. Mandelbaum,* 1998 WL 647208, at *1 (D.D.C. Aug. 19, 1998). The privilege does not automatically attach to any and all communications between an attorney and a client; it is specific and narrow in scope. *See Athridge v. Aetna Casualty and Surety Co.,* 184 F.R.D. 200, 209 (D.D.C.1998) (affirming that the District of Columbia Circuit is "one of the Circuits which construe

the attorney-client privilege strictly" and noting that "the strict-construction cases reason that a lawyer's communications can be privileged only derivatively—if disclosure of the lawyers' communications would reveal the content of the client's communication to the lawyer"). The privilege attaches to a *client's* communication with his or her attorney when the "communication was made for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceedings." *Overseas Private Inv. Corp.,* 1998 WL 647208, at *1 (quoting *In re Sealed Case,* 737 F.2d 94, 98–9 (D.C.Cir.1984)). The privilege attaches to an *attorney's* communication with his or her client "only insofar as the attorney's communications disclose the confidential communications from the client." *Evans v. Atwood,* 177 F.R.D. 1, 4 (D.D.C.1997) (quoting *Brinton v. Dep't of State,* 636 F.2d 600, 603–04 (D.C.Cir.1980)).

■■■ Confidential communication in the context of the attorney-client privilege means "the information is to be protected if one can say that the person who communicated the information never intended it to be disclosed and, but for its disclosure now, it would never have been known." *Evans,* 177 F.R.D. at 6. A client engages in confidential communication with an attorney when the client "reasonably believes that no one will learn the contents of the communication." *Id.* (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121 (Proposed Final Draft No. 1, 1996)).

The crucial questions are: (1) whether the communication by the client to its attorney was for the purpose of seeking legal advice or legal representation; (2) whether the client had a reasonable belief that the communication was confidential and intended it to be confidential; and (3) whether the disclosure of this communication would tend to reveal this confidential information. *U.S. v. Motorola, Inc. and Nextel Communications, Inc.,* 1999 WL 552553, at *2 (D.D.C. May 28, 1999).

IV. *Document B and the Attorney–Client Privilege*

As stated in my Memorandum Opinion of January 29, 2003, Document A is not confi-

dential and is, therefore, not privileged. Document A is a letter and a spreadsheet that transmit information regarding the valuation of stock from Ms. Kim Hargis ("Hargis"), a client, to Mr. Larry S. Stern ("Stern"), her attorney. The substance of both the letter and the spreadsheet explains the valuation of the company's stock as of December 31, 1997. *Defendant Network Virginia's Motion for Partial Reconsideration* ("D.Mot."). There is nothing in the document suggesting that its author had the intention or expectation that its content never be disclosed. To the contrary, the author was describing an accounting process that was a known fact.

Document B is a communication between Stern and Mr. Raoul Socher ("Socher"), Stern's client. This document contains no information regarding the value of the stock as of December 31, 1997. I, therefore, now conclude that Document A is substantively different from Document B and must now determine whether the attorney-client privilege applies to it, irrespective of the application of the attorney-client privilege to Document A.

█ Because Document B is a letter from an attorney to a client, the privilege attaches only if the "attorney's communications disclose the confidential communication from the client." *Evans*, 177 F.R.D. at 4; *see Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242 (D.C.Cir.1977) (affirming a strict interpretation of the attorney-client privilege by stating: "[T]hus the assertion that what the lawyer tells the client is privileged even though it cannot possibly disclose what the client told the lawyer is simply not the law of this Circuit."). Thus, the question remains whether Stern's letter to Socher discloses information that Socher intended to remain confidential. *See Evans*, 177 F.R.D. at 6 ("[T]he information is to be protected if one can say that the person who communicated the information never *intended* it to be disclosed and, but for its disclosure now, it would never have been known.") (emphasis added).

As I noted above, the privilege attaches to communications made by an attorney when the purpose of the client's communication was to secure "(i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceedings." *Overseas Private Inv. Corp.*, 1998 WL 647208, at *1. The very first sentence of the letter discloses why a client communicated with his attorney, seeking his advice. If this document were disclosed, plaintiff would learn the purpose of Socher's communication to Stern. While the reason an attorney is retained may not be privileged, communication by an attorney that would "reveal the content of the client's communication to the lawyer" is considered privileged. *Athridge*, 184 F.R.D. at 209. By seeing the letter, one would learn why the client sought the lawyer's advice and thereby learn the nature of the communication that the client intended to be between himself and his counsel. Clearly, disclosure of the letter would reveal a confidential communication that the client never intended to be seen by anyone but his counsel. *Evans*, 177 F.R.D. at 6.

Therefore, Document B, otherwise known as NSVA0121207 0121209, is protected by the attorney-client privilege and shall not be disclosed.

## V. Legal Standard for Relevance and Burdensome Objections

Rule 26(b) states that "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense in any part...." FED.R.CIV.P. 26(b)(1). The rule indicates, however, that "relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

█ A document or other discoverable material is relevant when the information it contains is "relevant to the claim or defense in any part." *Id.* Moreover, whether material is relevant is "in turn, a function of the relationship of the data to the ... central accusations of this [*sic*] lawsuit." *McPeek v. Ashcroft*, 212 F.R.D. 33, 34 (D.D.C.2003). Discovery of relevant materials includes "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case."

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978).

However, the discovery of a document may be limited if the document is "unduly burdensome." *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 453 (D.D.C. 2002). To determine the level of burden a document places on the responding party, the court "should balance the need for discovery against the burden imposed on the person ordered to produce the documents." *Id.* at 452. The court entertains the burdensome objection only when the responding party demonstrates how the document is "overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden." *Athridge*, 184 F.R.D. at 191. The responding party cannot "merely state, in conclusory fashion, that the requests are unduly burdensome." *Id.*

## VI. *Resolution of Pending Objections*

In reviewing the Joint Motion for Clarification, I find defendant's interpretation to be correct. The scope of my order can be inferred from the introductory paragraph, which states, "I herein only address this motion to compel with respect to the documents claimed to be privileged." *Memorandum Opinion, January 29, 2003* at 1. In that opinion, I only focused upon those documents challenged under the attorney-client privilege. I did not address any other issues briefed in the relator's motion to compel or defendant's accompanying opposition to that motion. I now address those documents withheld by defendants under the claims of irrelevancy and burdensomeness.

### Background

From November 23, 1993, through July 18, 1997, Network California, Network Federal, NetSoft, and Network Virginia were involved in the U.S. Small Business Administration ("SBA"), Section 8(a) Minority Small Business Development Program ("Section 8(a) Program"). Third Amended Complaint,

¶ 102. This program allows federal agencies and entities to "set aside" certain contracts for the sole benefit of Section 8(a) program participants. *Id.* ¶ 26. This process allows small, minority-owned businesses to obtain government contracts with little to no competition. To qualify as a Section 8(a) program participant, the company must meet three requirements. First, the company must be "socially and economically disadvantaged." 15 U.S.C. § 637(a)(4)(A).[1] For a company to be socially and economically disadvantaged, either one or more socially and economically disadvantaged persons must "unconditionally" own at least 51% of the company, or 51% of the publicly traded stock must be "unconditionally owned by one or more socially and economically disadvantaged individuals." 15 U.S.C. § 637(a)(4)(A)(i)–(ii).

Second, the "management and daily business operations must be controlled by one or more socially and economically disadvantaged individuals." 15 U.S.C. § 637(a)(4)(B). Socially disadvantaged individuals are those individuals who have been "subjected to racial or ethnic prejudice or cultural bias because of their identity as a member [*sic*] of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). Economically disadvantaged individuals are those individuals unable to "compete in the free enterprise system ... due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). When determining if an individual qualifies as "economically disadvantaged," the government considers the assets and net worth of the individual. *Id.*

Finally, each Section 8(a) program participant must certify on an annual basis that each of the above-mentioned requirements concerning ownership and control of the company still exist. 15 U.S.C. § 637(a)(4)(C). The Section 8(a) program requires each participant to submit the following annually:

(i) a personal financial statement for each disadvantaged owner; (ii) a record of all payments made by the Program Partici-

---

**1.** All references to the United States Code are to the electronic versions that appear in either Westlaw or Lexis.

pant to each of its disadvantaged owners or to any person or entity affiliated with such owners; and (iii) such other information as the Administration may deem necessary to make the determinations required by this paragraph.

15 U.S.C. § 637(a)(6)(B).

Relator brings this suit against defendants under the False Claims Act.[2] Relator claims that defendants engaged in false claims, false statements, false records, and a conspiracy to enter into the Section 8(a) program and obtain government contracts with little to no competition. Third Amended Complaint, ¶ 1.

## General Temporal Limitation

 Relator seeks *all* documents regarding defendants' involvement in the Section 8(a) program, but defendants only participated in the program for a specific length of time. Appropriately, I will limit the obligation of the defendant to produce documents to documents produced in the period of November 23, 1993 to July 18, 1997, the period in which defendants enjoyed the benefits of the program. *See Waters v. United States Capitol Police Board,* 216 F.R.D. 153, 2003 WL 21004636 at *5 (D.D.C. May 6, 2003) (noting that when the nature of the case calls for an enormous amount of discovery material, temporal scope limitations are effective because they "strike a balance between plaintiff's need for comparative information and the burden upon the defendant to find information I [*sic*] am ordering it to produce").

## Organization of This Opinion

Due to the volume of documents requested by the relator, I have created a document chart that summarizes the document requests. The attached exhibit, entitled "Document Summary," has five headings. The first heading, "Subject," corresponds to the categories in this memorandum opinion. For example, on the chart, the first line under "Subject" is "Section 8(a)," which means I address this document under the "Section 8(a)" heading in my opinion. The second heading, "Document," indicates the nature of the documents sought as stated by the rela-

tor when making his initial document requests.

The third heading, "NSA–CA" corresponds to the *Relator's Motion to Compel Immediate Production of Documents by All Defendants,* exhibit 7. Under the "NSA–CA" heading, the numbers within the NSA–CA column correspond to the request for production number. For example, the first row on the chart, described as "All documents that refer or relate to the creation of any entity that used Sec. 8(a) certification to market or sell NSA–CA software or services to the U.S. Government," corresponds to relator's request for production number five. *See Relator's Motion to Compel,* exhibit 7, the *Request for Production* from NSA–CA.

The fourth heading, "NetSoft" corresponds to the *Relator's Motion to Compel Immediate Production of Documents by All Defendants,* exhibit 10. The organization of this column is the same as the "NSA–CA" column. For example, the third row on the chart with the requested document, described as "All documents that refer or relate to any NetSoft Sec. 8(a) certification to market or sell software or services to the U.S. Government," corresponds to relator's request for production number five. *See Relator's Motion to Compel,* exhibit 10, the *Request for Production* from Netsoft.

Finally, the fifth heading, "NSA–VA," corresponds to the *Relator's Motion to Compel Immediate Production of Documents by All Defendants,* exhibit 11. The organization of this column is the same as the "NSA–CA" column. For example, the second row on the chart with the requested document, described as "All documents relating to NSA–CA's eligibility to participate in the Sec. 8(a) program," corresponds to relator's request for production number 14. *See Relator's Motion to Compel,* exhibit 11, the *Request for Production* from Netsoft.

### A. *Section 8(a)*

 The first group of requested documents is categorized as Section 8(a) materi-

---

2. 31 U.S.Code § 3729 *et seq.*

al.[3] The nature of the documents sought is indicated in the chart. I find that all of these documents are discoverable subject to the temporal limitation I have previously set forth above with one limitation. The documents submitted to the Small Business Administration and the General Accounting Office or any other government agency must be documents relating to the defendants' participation in the Section 8(a) program. Additionally, as to all documents submitted to a third party relating to a Section 8(a) contract, I will require that all documents came into existence because of a party's Section 8(a) eligibility or because a party represented such eligibility.

### B. *Corporate History*

■ The second group of requested documents is categorized as corporate history.[4] This category includes documents relating to the creation, sale, and operation of the different defendant companies and related entities such as corporations said to have purchased the assets of the defendant companies. All of these documents are also discoverable because they will disclose the history of the creation of the defendant corporations and describe the distribution of ownership in them as well as other companies said to have succeeded them or purchased their assets. This directly relates to relator's contention that Ivan Socher controlled Network California, the Section 8(a) corporation, by means of his control of other entities and corporations. There is one exception. The request for "all documents that refer or relate to the operation of Net Soft" is too broad. . It would theoretically include every piece of paper in the file.

### C. *Financial History*

■ The third group of requested documents is categorized as financial history.[5] This category includes documents relating to accounting and financial statements. These documents are also discoverable insofar as they indicate the financial status of the company and its owners between November 23, 1993 and July 18, 1997. Again, the financial structure and status of the various corporations involved relate to plaintiff's claim that the corporations were manipulated to have a Section 8(a) corporation serve as a "front" for non-Section 8(a) corporations. There are once again, exceptions. I do not see how the following documents could be relevant to that claim or to any defense to it:

1. Documents referring to capital contributions or investments made by shareholders.
2. Documents referring to acquisition of assets from individual defendants.
3. State and federal tax returns.
4. Documents submitted to the IRS relating to a request for a ruling.

I will therefore not require production of these documents. Finally, as to all internal accounting documents relating to the sales of products or services to the U.S. Government, the sales must have been pursuant to a Section 8(a) contract.

### D. *Employee Records*

■ The fourth group of requested documents is categorized as employee records.[6]

---

3. The requests for production are as follows:
 1. Network California-requests for production 5–16 and 49.
 2. NetSoft-requests for production 4–16.
 3. Network Virginia-requests for production 13–24.
 *Relator's Motion to Compel Immediate Production of Requests for Production by All Defendants*, exhibits 7, 10, 11.

4. The requests for production are as follows:
 1. Network California-requests for production 1–4, 22, 23, and 51.
 2. NetSoft-requests for production 1 and 20.
 3. Network Virginia-requests for production 1, 2, 6, 11, and 12.
 *Id.*

5. The requests for production are as follows:
 1. Network California-requests for production 17–19, 21, 24–26, 42–48, 50, and 52.
 2. NetSoft-requests for production 2, 17, 18, 19, 21, 32, and 33.
 3. Network Virginia-requests for production 5, 7, 8, 25, and 26.
 *Id.*

6. The requests for production are as follows:
 1. Network California-requests for production 20 and 27–40.
 2. NetSoft-requests for production 22–26 and 28–31.
 3. Network Virginia-requests for production 3, 4, and 10.

This category includes any documents relating to employee benefits, individual employee compensation, and individual employee work schedules. It is obvious that relator wants to compare all incidences of the employment of the individual defendants, such as hours worked and compensation, to try to prove that the minority employees were "phantom" or employees in name only. That comparison seems legitimate, and I will permit the discovery requested.

### E. Miscellaneous Requests for Production

The final group of requests for production must be categorized as miscellaneous.[7]

■ ALLURA. According to paragraphs 62–63, Ivan Socher and another person formed a new venture called ALLURA, and Socher intimidated Network Federal employees into devoting time to this new venture. Information about this non-party corporation that has no ties to the Section 8(a) program is unlikely to lead to admissible evidence.

■ *Documents referring to events alleged in paragraphs 67 and 74 of the Third Amended Complaint.* These two paragraphs are part of a narrative that details allegations as to how completely Socher controlled NetSoft despite the presence of a minority, the defendant Issac Kong, as CEO of NetSoft (¶ 67) and how Socher engaged in a ruse to have Network Federal pay Kong a bonus (¶ 74). Information pertaining to these transactions would pertain to Ivan Socher's supposed use of the Section 8(a) corporation for his own purposes and would therefore be relevant to relator's claim.

■ *Documents that refer or relate to relator.* As framed, the request is too broad. I will only require the production of documents as to relator that may be used to impeach or contradict him or that pertain to his veracity or honesty.

*Id.*

---

7. The requests for production are as follows:
 1. Network California-requests for production 41 and 53.

■ *Documents that refer or relate to communications among defendants concerning this lawsuit.* These documents may contain admissions of liability and therefore relate to relator's claim.

### Burdensomeness

Each defendant merely states, in a one-sentence objection, that the "requests are unduly burdensome, oppressive, vague, ambiguous, and overbroad." *Relator's Motion to Compel Immediate Production of Requests for Production by All Defendants,* exhibits 7, 10, 11, 17, 18, 19, 20, 21, 22, 23, 24, 25, 28, 29. As I noted above, I do not consider "boilerplate" objections based on burdensomeness. Instead, the objection must be accompanied by an affidavit that explains why the request is burdensome. Hence, this general objection is overruled. *See Athridge,* 184 F.R.D. at 191 (holding that the responding party cannot "merely state, in conclusory fashion, that the requests are unduly burdensome").

### CONCLUSION

An Order accompanies this Memorandum Opinion.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is, hereby, **ORDERED THAT:**

1. The motion to compel production of the *NSVA0121207–0121209* is denied.

2. *Section 8(a) Paperwork:* In accordance with the Memorandum Opinion, defendants shall respond to the following Requests for Production ("RFP"):
 Network California: RFP Nos. 5–16 and 49.
 NetSoft: RFP Nos. 4–16.
 Network Virginia: RFP Nos. 13–24.

3. *Corporate History:* In accordance with the Memorandum Opinion, defendants

---

3. Network Virginia-requests for production 27.
*Id.*

shall respond to the following Requests for Production ("RFP"):

Network California: RFP Nos. 1–3, 22, 23, and 51.

NetSoft: RFP Nos. 1 and 20.

Network Virginia: RFP Nos. 1, 2, 6, 11, and 12.

4. *Financial History:* In accordance with the Memorandum Opinion, defendants shall respond to the following Requests for Production ("RFP"):

Network California: RFP Nos. 17–19, 21, 24–26, and 43–48.

NetSoft: RFP Nos. 2, 17, 18, 19, 21, 32, and 33.

Network Virginia: RFP Nos. 7, 25, and 26.

5. *Employee Records:* In accordance with the Memorandum Opinion, defendants shall respond to the following Requests for Production ("RFP"):

Network California: RFP Nos. 20 and 27–40.

NetSoft: RFP Nos. 22–26 and 28–31.

Network Virginia: RFP Nos. 3, 4, and 10.

6. *Miscellaneous Documents:* In accordance with the Memorandum Opinion, defendants shall respond to the following Requests for Production ("RFP"):

Network California: RFP Nos. 41 and 53.

NetSoft: RFP Nos. 3, 27, 34, and 35, with the understanding that NetSoft is only required to produce documents that may be used to impeach relator or pertain to his veracity or honesty.

Network Virginia: RFP No. 27.

**IT IS FURTHER ORDERED THAT** the obligations imposed by this Order pertain only to documents created in the period of November 23, 1993 to July 18, 1997.

**IT IS FURTHER ORDERED THAT,** in all other respects, *Relator's Motion to Compel Immediate Production of Documents by All Defendants* is denied.

**IT IS FURTHER ORDERED THAT** *Defendant Network Virginia's Motion for Par-*tial *Reconsideration* [# 90] is **GRANTED.** It is further, hereby,

**ORDERED** that Relator and Defendant's *Joint Motion for Clarification* [# 93] is **GRANTED.**

**SO ORDERED.**