# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**FILED**
**May 14, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**State of West Virginia, ex rel.**
**Heartland of Beckley WV, LLC,**
**Heartland of Clarksburg WV, LLC,**
**Heartland of Rainelle WV, LLC,**
**Heartland of Martinsburg WV, LLC,**
**Heartland-Preston County of Kingwood, LLC,**
**Heath Care and Retirement Corporation of America, LLC, d/b/a Heartland of Charleston,**
**Petitioners**

**vs.)  No. 20-0961**

**West Virginia Bureau for Medical Services,**
**Respondent**

## MEMORANDUM DECISION

The petitioner in this case is HCR, a company that in 2012 operated seven nursing facilities in West Virginia under the name "Heartland." The petitioner seeks a writ of prohibition to halt the enforcement of a November 15, 2018, decision of the West Virginia Bureau for Medical Services ("BMS"). The BMS decision remands the case to an administrative hearing officer for the introduction of additional evidence. HCR did not object to the BMS decision, before or after it was entered, and did not thereafter appeal BMS's decision. Instead, HCR waited over two years, until December 4, 2020, to file its petition for a writ challenging the BMS remand decision. The petitioner, HCR, appears by counsel Gordon H. Copland. The respondent, BMS, appears by counsel Kimberly Stitzinger.

The Court has considered the parties' briefs, the appendix record, and the oral arguments of the parties. Upon consideration of the applicable standard of review for a writ of prohibition, the Court finds no substantial question of law for consideration and no error in the lower tribunal's decision. For these reasons, a memorandum decision denying the requested writ of prohibition is appropriate under Rule 21 of the Rules of Appellate Procedure.

This case has its origins in HCR's June 2012 request for reimbursement by BMS of certain Medicaid-related expenses that HCR claims it incurred in the operation of its nursing facilities. BMS is the state agency charged with administering West Virginia's Medicaid program, and in so doing it relied upon the "State Medicaid Plan," a document that outlined the scope of "allowable" expenses that may be reimbursable to nursing facilities. The document required nursing facilities to submit a report of allowable expenses twice a year (in June and in December) to assist BMS in calculating reimbursement rates under the Medicaid program. The 2012 State Medicaid Plan included "liability insurance" expenses as an allowable cost but did not clearly define what was properly included in, or excluded from, a nursing facility's "liability insurance" expenses.

1

Between 2010 and 2012, BMS noticed that HCR's documentation of expenses included a dramatic increase in HCR's liability insurance expenditures. In June of 2012, HCR reported that its liability insurance costs exceeded $8,000 per bed at each of its seven facilities. However, the next highest claim per bed, at a facility not owned by HCR, was $2,367 per bed. BMS, troubled by these abnormal expenses, subjected HCR's June 2012 report to a desk audit and learned that HCR was including payments of various legal claims as a liability insurance expense. BMS thereafter eliminated the legal claims from HCR's expense reports in calculating reimbursement costs.[1]

HCR challenged the BMS decision. An evidentiary hearing was conducted before an administrative hearing officer, and the hearing officer drafted a recommended decision that supported BMS's determination that HCR's paid legal claims were not allowable expenses. BMS then issued a final decision adopting the hearing officer's recommendation. HCR appealed to the circuit court which affirmed the BMS decision. HCR finally appealed to this Court.

In a memorandum decision, this Court reversed. *Heartland of Beckley, LLC v. Bureau for Medical Services*, No. 15-0595, 2016 WL 6248620 (W.Va. Oct. 26, 2016). We examined the various laws, rules and manuals governing the actions of BMS and concluded that, in considering HCR's report of expenses, BMS failed to consider language in the federal Medicare "Provider Reimbursement Manual." That manual provided that certain paid legal claims, like those submitted by HCR, *may be* allowable. Specifically, the Court found that those legal claims "which are reasonable, are allowable . . . up to a certain amount (essentially, up to ten percent of HCR's net worth). However, . . . [another federal regulation] prohibits a nursing facility's costs from being 'substantially out of line' from *comparable institutions*." *Id.* at *5 (emphasis added). Our memorandum decision noted the following definition of "reasonable costs" in the "Provider Reimbursement Manual" which, importantly, suggests a means of assessing "comparable institutions":

> [P]roviders are reimbursed the actual costs of providing high quality care, regardless of how widely they may vary from provider to provider, *except* where a particular institution's costs are found to be *substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors.*

*Id.* (emphasis in original) (quoting CENTERS FOR MEDICARE AND MEDICAID SERVICES, PROVIDER REIMBURSEMENT MANUAL § 2100, in part).

Accordingly, we reversed the circuit court and BMS decisions and remanded the case with the requirement that the parties introduce evidence as to whether and what portion of HCR's paid

---

[1] BMS subsequently revised its definition of "liability insurance" expenses and, effective in January 2013, clarified that the various legal costs included by HCR in its June 2012 report were non-allowable costs. *See Heartland of Beckley, LLC v. Bureau for Medical Services*, No. 15-0595, 2016 WL 6248620 * 3 (W.Va. Oct. 26, 2016).

legal claims could be included in its June 2012 cost report. *Id*. at *6. The circuit court subsequently remanded the case to BMS.

In May of 2018, an administrative hearing officer conducted a new evidentiary hearing on behalf of BMS. At that hearing, a BMS accountant testified that she had reviewed this Court's *Heartland* memorandum decision. However, despite that decision, the BMS accountant opined that most (but not all) of the liability costs submitted by HCR in its June 2012 report should be disallowed because the costs were "substantially out of line" from comparable institutions. By "comparable institutions," the BMS accountant stated she was comparing nursing facilities in West Virginia by the numbers of beds in each building. Specifically, she noted that a facility with ninety-one beds or more was a "large" institution, and a facility with ninety or fewer beds was "small." Six of HCR's seven facilities qualified as a "large" facility and one qualified as a "small" facility. In reaching her conclusion that the HCR facility expenditures "were substantially out of line when compared to these comparable facilities," the BMS accountant compared the HCR large facilities against the other large nursing facilities operating in West Virginia in 2012, and likewise compared HCR's small facility against other small nursing facilities operating in West Virginia in 2012.

HCR offered an accounting expert to refute BMS's assessment. HCR's expert also criticized the BMS accountant's approach and insisted that BMS should not be relying solely upon the number of beds to assess whether one facility is "comparable" to another facility.[2] Thereafter, the BMS accountant was recalled to the witness stand. The hearing officer then asked the BMS accountant about this Court's *Heartland* decision and whether BMS had used the factors listed in the Court's opinion: "size, scope of services, utilization, and other relevant factors from the Provider Reimbursement Manual." The BMS accountant testified that when the Court directed BMS to apply these standards, the Court had effectively imposed an entirely new process upon which BMS had never relied. Apparently, BMS relied upon the number of beds in a facility to measure comparability because it was the only information provided by nursing facilities and that was available to BMS. As the BMS accountant stated, "I don't have the other information. I don't have their net worth. I don't have what their scope of business is. I treat all the nursing homes the same except for the two distinct bed sizes." Moreover, the BMS accountant said that, other than the numbers of beds in a facility, BMS "did not have the resources or the wherewithal at the agency to look into things like . . . scope of services, utilization, and other relevant factors[.]"

At the conclusion of the hearing, the administrative hearing officer drafted a detailed and thorough recommended decision for entry by BMS. On November 7, 2018, copies of the recommended decision were provided to counsel for BMS and counsel for HCR. The administrative hearing officer acknowledged in the recommended decision that BMS did not apply the regulations outlined in this Court's 2016 *Heartland* opinion because the agency "had inadequate resources to do so." However, the administrative hearing officer explained the long-established concepts of the "law of the case" and the "mandate" of an appellate court, concepts whereby an appellate court's opinion establishes the framework that controls the acts of a lower tribunal on remand. The administrative hearing officer reasoned that "the law of the case and

---

[2] We do not delve into the substance, quality or weight of the parties' evidence. The measure of those matters is solely for the BMS hearing officer on remand.

3

mandate" set forth in *Heartland* "have not been followed" because BMS failed to conduct an assessment using the Medicare guidelines discussed in *Heartland*. Because of this, the administrative hearing officer recommended to BMS that "the matter must be remanded so that the Bureau can apply the methodology set forth by the Supreme Court in *Heartland*."

HCR did not object to the administrative hearing officer's recommended decision. There is also nothing in the record showing that HCR offered any comments to BMS suggesting that it alter the recommended decision. Accordingly, on November 15, 2018, the Commissioner of BMS entered a "Decision" adopting, without modification, the hearing officer's recommended decision. Thereafter, there is nothing in the record showing any objection or challenge by HCR to the entry of the BMS decision. Moreover, HCR never sought to appeal the November 2018 decision to the circuit court.

Twenty-five months later, on December 4, 2020, petitioner HCR filed the instant petition for a writ of prohibition to halt enforcement of the November 2018 BMS remand decision. HCR asserted that the decision unfairly imposes on HCR the burden and expense of a new hearing, and that the decision is unfair because BMS will have had the benefit of seeing HCR's full case in advance. We granted a rule to show cause and permitted the parties to orally argue their positions. We now deny the requested writ.

"This Court is restrictive in the use of prohibition as a remedy." *State ex rel. W. Va. Fire & Cas. Co. v. Karl*, 199 W. Va. 678, 683, 487 S.E.2d 336, 341 (1997). "Prohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for writ of error, appeal or certiorari." Syl. pt. 1, *Crawford v. Taylor*, 138 W.Va. 207, 75 S.E.2d 370 (1953); *accord*, Syl. pt. 2, *State ex rel. Peacher v. Sencindiver*, 160 W. Va. 314, 233 S.E.2d 425 (1977) ("A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. W. Va. Code 53-1-1."). *See also*, Syl. pt. 1, in part, *Hinkle v. Black*, 164 W. Va. 112, 262 S.E.2d 744 (1979) ("In determining whether to grant a rule to show cause in prohibition when a court is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and money among litigants, lawyers and courts[.]").

Petitioner HCR does not allege that the lower tribunal has acted without jurisdiction; instead, it argues that BMS is exceeding its legitimate powers. In cases such as these, we consider five factors to determine whether to issue a discretionary writ of prohibition. Those factors are:

> (1) *whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief*; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be

4

satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, in part, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996) (emphasis added).

We focus our analysis on the first factor of *Hoover* and find that petitioner HCR has failed to establish an entitlement to a writ of prohibition. The first factor is whether the party seeking the writ had any other adequate means to obtain the desired relief. BMS argues that HCR should have filed a petition for review of the November 2018 BMS decision in the circuit court "within thirty days after the date upon which" HCR received notice of the decision. *W. Va. Code* § 9-2-13(d) (2018). Accordingly, BMS takes the position that HCR waited over two years to take any action and is now attempting to seek a writ of prohibition to compensate for its failure to file a timely appeal.

However, we see that HCR had another adequate means to obtain relief that preceded any appeal to circuit court: it could and should have raised an objection or complaint to the administrative hearing officer's recommended decision with BMS.[3] While a writ of prohibition is designed to prevent "a palpable, substantial, or irremediable injustice, or to preserve the order and regularity of judicial proceedings," 72A C.J.S. Prohibition § 11 (2021), it is a long-standing principle that objections to non-jurisdictional issues should first be made in the lower tribunal to preserve the issue for subsequent review by way of a petition for a writ of prohibition. "Before a writ of prohibition is granted, it generally must appear that the petitioner has applied to the inferior court or judge for relief." 72A C.J.S. Prohibition § 59 (2021). Hence, for a party to establish a right to a writ of prohibition, the "party must alert a tribunal as to perceived defects at the time such defects occur," and if the tribunal is not so alerted, this Court will deny prohibition and will not "consider an error which is not properly preserved in the record nor apparent on the face of the record." *State ex rel. State Farm Mut. Auto. Ins. Co. v. Bedell*, 228 W. Va. 252, 264, 719 S.E.2d 722, 734 (2011) (citations omitted).[4] HCR failed to object to the hearing officer's recommended

---

[3] In examining the briefs, record and oral argument in this case, it appears that the parties do not identify the specific procedures which govern BMS administrative hearings. We assume without deciding, however, that the hearings are affected by a regulation established by BMS's parent agency, the Department of Health and Human Resources, which provides that at the conclusion of an administrative hearing, a hearing officer must prepare a report or recommendation that contains proposed findings of fact and conclusions of law. 69 C.S.R. § 9.2 (2015). The regulation then provides: "The parties to the hearing shall then be permitted seven days in which to file objections or comments upon the report and recommendation and three more days to respond to each others' objections or comments." *Id*.

[4] It is a well-established principle that "[t]his Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syl. pt. 2, *Sands v. Security Trust Co.*, 143 W. Va. 522, 102 S.E.2d 733 (1958); *accord* Syl. pt. 2, *Cameron v. Cameron*, 105 W. Va. 621, 143 S.E. 349 (1928) ("This court will not review questions which have not been decided by the lower court."). *See also, Honaker v. Mahon*, 210 W. Va. 53, 60, 552 S.E.2d

Continued . . .

decision before its entry by BMS, and HCR similarly failed to object or complain about the decision to BMS after its entry. On this record, it would be inappropriate for this Court to inform BMS that it has acted wrongly when it did not have an opportunity to address the matter in the first instance.

Accordingly, because HCR did not object, comment, complain or otherwise raise its nonjurisdictional issue with the BMS decision below, and instead raised it for the first time in its petition to this Court over two years after entry of the decision, we deny the requested writ of prohibition.

Writ denied.

**ISSUED:** May 14, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

---

788, 795 (2001) ("[T]he general rule [is] that a party's failure to object waives any right to appeal an issue."); *Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 114, 459 S.E.2d 374, 391 (1995) ("To be clear, the party complaining on appeal of the admission of evidence bears sole responsibility for adequately preserving the record for meaningful appellate review."); *Loar v. Massey*, 164 W. Va. 155, 159, 261 S.E.2d 83, 86 (1979) ("[O]bjections on non-jurisdictional issues, must be made in the lower court to preserve such issues for appeal."); *Konchesky v. S. J. Groves & Sons Co.*, 148 W. Va. 411, 414, 135 S.E.2d 299, 302 (1964) ("[I]t has always been necessary for a party to object or except in some manner to the ruling of a trial court, in order to give said court an opportunity to rule on such objection before this Court will consider such matter on appeal.").